**25-MJ-6114 – 6116-MPK**

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS**

I, Brian W. Simpkins, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Massachusetts State Police ("MSP") Trooper since 2006, and a Sergeant since October 2023. As a Trooper, I was initially assigned to patrol out of the Framingham, Sturbridge, and Boston Barracks, and then to the Community Action Team in the city of Boston working in a high crime area focusing on gang and drug activity.

2. Since July 2016, I have been assigned as a Task Force Officer ("TFO") to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Drug Enforcement Administration ("DEA"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Immigration and Customs Enforcement Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies.

3. I am a graduate of the Municipal Police Training Committee ("MPTC") Police Academy (9th Municipal Police Officers Class, Weymouth), and the Massachusetts State Police Academy (79th Recruit Training Troop, New Braintree). Prior to becoming a trooper, I was a Canton Police Officer in a full and part-time capacity from 2001 to 2006. I have a Bachelor of Science degree in Criminal Justice from the Northeastern University. I have attended numerous narcotics investigation courses, including a two-week narcotics investigation training with the DEA, focusing on narcotics recognition, identification, and investigation.

4. During my time as a police officer and TFO, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. A number of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

## PURPOSE OF THE AFFIDAVIT

5. I submit this affidavit in support of a criminal complaint charging that beginning at least in or about January 2023 and continuing until the present, Leury Then ROSARIO did knowingly and intentionally conspire with others known and unknown, to possess with intent to distribute and to distribute 400 grams or more of a mixture or substance containing fentanyl, and methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vi) (the "Target Offense").

6. This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

a. 20 Crestshire Drive, Lawrence, Massachusetts ("Target Location 1"), described in Attachment A-1; and

b. 430 Essex Street, First Floor, Lawrence, Massachusetts ("Target Location 2"), described in Attachment A-2,

(collectively, the "Target Locations").

7. The facts in this affidavit come from my personal observations and information obtained from other agents, investigators, and witnesses. My interpretations of conversations, conduct, and events detailed herein are based on my training and experience and knowledge of the investigation. This affidavit is intended to show that there is sufficient probable cause to believe that ROSARIO has committed the Target Offense, and that evidence, fruits, and instrumentalities of that offense will be found in the Target Locations as described below and in Attachment B. Accordingly, this affidavit does not set forth all of my knowledge about this matter. All times herein are approximate.

## PROBABLE CAUSE

### Background of Investigation

8. In January 2023, investigators began targeting a drug trafficking organization ("DTO") that was being supplied fentanyl and methamphetamine by a Sinaloa, Mexico-based DTO led by an indicted defendant (the "Indicted Defendant") who was residing in Sinaloa. During the course of that investigation, investigators seized fentanyl, methamphetamine, cocaine, cash,

and firearms from a number of targets. That investigation resulted in three separate indictments charging numerous defendants with drug and firearms offenses.

9. One of the charged defendants ("CD-1") who was being supplied by the Indicted Defendant began cooperating with investigators post-arrest. CD-1 told investigators that ROSARIO was a Lawrence-based drug trafficker who was also being supplied controlled substances by the same Indicted Defendant. According to CD-1, CD-1 and ROSARIO supplied each other with controlled substances, including in 2024 prior to CD-1's arrest. For example, CD-1 described two occasions in 2024 when CD-1 purchased 500 grams and 800 grams of fentanyl from ROSARIO. Communications on CD-1's phone between CD-1 and a phone used by ROSARIO corroborated the information provided by CD-1. For example, ROSARIO sent CD-1 photographs of counterfeit pressed pills in multiple colors and sizes and a video depicting what appears to be multiple pounds of methamphetamine divided in multiple packages.

10. Another of the charged defendants ("CD-2") who was being supplied by the Indicted Defendant also began cooperating with investigators post-arrest. Investigators had previously obtained warrants to search four cellular phones seized from CD-2 in October 2023. A search of CD-2's phones revealed numerous communications between CD-2 and another phone used by ROSARIO, including several photographs of kilograms of suspected drugs, videos of kilograms of drugs, a photograph of one of ROSARIO's associates, Yoel BRITO, with his hands covered in white powder and appearing to be impaired, a photograph of a pill press, and a photograph of a bag containing a large quantity of cash. In November 2024, CD-2 confirmed that the above-referenced communications were with ROSARIO and that ROSARIO was in fact being supplied with controlled substances by the Indicted Defendant. CD-2 further stated that CD-2

and ROSARIO would supply controlled substances to each other, including multiple kilograms of fentanyl worth over $100,000.

11. In May 2024, the Lawrence Fire Department responded to a residence located at 9 Salem Street in Lawrence, Massachusetts in response to a CO2 alarm activation inside of that residence. Upon entry, the firefighters observed in the basement area large quantities of suspected controlled substances and two large pill presses. The two pill presses were inside a basement bathroom which was locked. The firefighters called the Lawrence Police Department, and officers responded to the location. Officers seized, pursuant to a search warrant, large quantities of methamphetamine and fentanyl, counterfeit pressed pills and orange and yellow powder used to manufacture counterfeit Adderall pills containing methamphetamine. On the day of the search, investigators did not have the equipment to safely remove the two large pill presses from the basement area, and thus, they were left in the basement. The following day, officers returned to the residence to seize the pill presses, but someone had already moved them out of the residence. Officers spoke with the owner of the residence, who confirmed that ROSARIO frequented the residence, including the basement apartment. Furthermore, the photos that ROSARIO sent other coconspirators of a pill press and pressed counterfeit pills corroborate ROSARIO's connection to the pill press and counterfeit pills found at 9 Salem Street.

**December 3, 2024, Undercover Fentanyl Purchase from ROSARIO at Target Location 2**

12. In early December 2024, investigators arranged for a DEA undercover officer ("UC-1") to purchase 100 grams of fentanyl from a fentanyl trafficker operating in the Lawrence, Massachusetts area. The transaction was coordinated with the user of telephone number (760) 481-6697 ("UM667"). Investigators had arranged with UM667 to conduct the transaction on December 3, 2024, and UM6697 provided a meeting location of 250 Methuen Street in Lawrence.

The front of 250 Methuen Street abuts the rear entrance and parking lot of 430 Essex Street, Target Location 2.

13. On December 3, 2024, investigators established surveillance in the vicinity of 250 Methuen Street and the rear parking lot of Target Location 2. At about 12:24 p.m., UC-1 sent a text message to UM6697 saying he was enroute to 250 Methuen Street. UC-1 was equipped with an electronic transmitting device that allowed investigators on scene to monitor his conversations.

14. At about 12:45 p.m., UC-1 arrived at 250 Methuen Street. At approximately 1:09 p.m., a black Honda Accord registered to ROSARIO's wife parked along the curbline in the vicinity of 250 Methuen Street. Moments later, a Hispanic male, later identified as ROSARIO, exited the Honda Accord and entered the rear door of 430 Essex Street—Target Location 2. At approximately 1:16 p.m., ROSARIO exited the rear door of Target Location 2 and got in the passenger seat of UC-1's vehicle. While in UC-1's vehicle, ROSARIO told UC-1 to go inside Target Location 2 to retrieve the fentanyl. After UC-1 declined to enter the building, ROSARIO got out of the vehicle and reentered the rear door of Target Location 2. UC-1 departed the area.

15. At approximately 1:35 p.m., ROSARIO exited the rear door of Target Location 2 and got back into the Honda Accord. ROSARIO drove the Honda Accord and parked in various locations within the vicinity of Essex Street before returning to 430 Essex Street and reentering the rear door of Target Location 2 at approximately 2:00 p.m.

16. During this timeframe, UC-1 exchanged a series of phone calls and text messages with UM6697. UM6697 eventually agreed to send someone out to deliver the fentanyl to UC-1, and instructed UC-1 to return to 250 Methuen Street.

17. At approximately 2:40 p.m., ROSARIO exited the rear of Target Location 2 and entered the Honda Accord. ROSARIO circled the block before returning to and parking in the

vicinity of 250 Methuen Street and Target Location 2. Investigators observed ROSARIO placing an item within the wheel area of the Honda Accord, and then entering the rear of Target Location 2.

18. At approximately 2:46 p.m., UC-1 arrived back at 250 Methuen Street and sent a text message to UM6697 indicating he had arrived. UM6697 told UC-1 that the fentanyl was on the wheel of the Honda Accord. UC-1 retrieved the suspected fentanyl from the wheel of the Honda Accord. The suspected fentanyl was wrapped in a knotted plastic bag and was sent to the DEA laboratory for testing, which confirmed that the substance contained 99.8 grams of fentanyl.

**Fentanyl Pill Seizures from ROSARIO's Redistributor Customer**

19. Between December 2023 and March 2024, investigators made several fentanyl pill seizures from an individual who was distributing fake oxycodone pills containing fentanyl. That individual ("CD-3") was subsequently charged with federal drug trafficking offenses, and began cooperating with law enforcement post-arrest.

20. During the course of the investigation, investigators used an undercover officer ("UC-2") to purchase fentanyl pills from CD-3. For example, on January 9, 2024, UC-2 purchased about 1,500 pressed fentanyl pills from CD-3 for $3,000 in North Andover, Massachusetts. Subsequent testing from a drug laboratory confirmed that those pills contained 190.7 grams of fentanyl. Then, on January 23, 2024, UC-2 purchased about 1,300 pressed fentanyl pills from CD-3 for $3,000 in Lawrence, Massachusetts. Subsequent testing from a drug laboratory confirmed that those pills contained 164.9 grams of fentanyl. On March 2024, in connection with CD-3's arrest, investigators seized over 2,700 additional pressed fentanyl pills from CD-3. Subsequent testing from a drug laboratory confirmed that those pills contained 330.2

grams of fentanyl. In total, investigators seized over 684 grams of fentanyl in the form of fake oxycodone pills from CD-3.

21. After CD-3 began cooperating with investigators post-arrest, CD-3 told investigators that CD-3 only purchased pressed fentanyl pills from ROSARIO and that ROSARIO supplied CD-3 with all of the pressed fentanyl pill seized by investigators, described above. CD-3 stated that CD-3 acquired pressed fentanyl pills from ROSARIO for redistribution on about five or six occasions in 2024. According to CD-3, each time CD-3 purchased fentanyl pills from ROSARIO, CD-3 met ROSARIO outside Target Location 2 to conduct the transaction, and ROSARIO would exit the rear door to Target Location 2 to meet CD-3.

## The Target Locations

22. **20 Crestshire Drive, Lawrence, Massachusetts:** Target Location 1 is a one-story residence located at 20 Crestshire Drive in Lawrence, Massachusetts. The residence at that location has tan siding and a single white front door under a centered covered porch. The number "20" is in black numerals on the porch above the front door, and there is a single mailbox to the right of the white front door. At the end of the driveway on the right side of the building is a two-car garage with two white garage doors that enter below the mail level of the building.

23. Based on physical and electronic surveillance, I believe that ROSARIO primarily resides at Target Location 1. The deed for Target Location 1 indicates that the residence is owned by Dilenia Barroso, who is the mother of Manuel BARROSO, who is an associate of ROSARIO. BARROSO was arrested by the Massachusetts State Police in July 2024 for drug trafficking offenses. The utilities at Target Location 1 are subscribed in the name "Yadel Pimentel," however, the listed subscriber phone number on the utility account is that of ROSARIO's wife, Sonia PIMENTEL. PIMENTEL regularly receives mail at Target Location 1, including as

recently as February 21, 2025. During the course of the investigation, physical and electronic surveillance have consistently showed ROSARIO at the residence on a near daily basis, including overnight, as recently as February 21, 2025. In addition, the vehicles operated by ROSARIO—including vehicles used in connection with his drug trafficking described herein—are regularly parked in the driveway at Target Location 1.[1]

24. Accordingly, I believe that evidence of ROSARIO's ongoing drug trafficking activities, including drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and records of other money transactions, as set forth in Attachment B, will be found at Target Location 1.

25. **430 Essex Street, First Floor, Lawrence, Massachusetts:** Target Location 2 is the first floor of the mixed-use building located at 430 Essex Street in Lawrence, Massachusetts. The building is a five-story building with a multiservice business, Exotic Multiservice, located on the first floor with apartments on the higher floors. The front side of Target Location 2, located on Essex Street, has a black awning with the numbers "430" in white and the yellow and white logo for Exotic Multiservice in large letters. The rear side of the building at Target Location 2 faces Methuen Street, with a large parking lot in the rear of Target Location 2. At the rear of the building at Target Location 2 is a red awning above a white rear door. The red awning has "430"

---

[1] Based on law enforcement reports for a warrant executed at Target Location 1 previously, upon entry through the white front door there are two doors—one leading to the left side of the house and another leading to the right side of the house. However, the residence has a single address, a single mailbox, a single utilities account, and a single Comcast account. During the investigation, law enforcement has queried the cars regularly parked in the driveway and the vehicles that are regularly parked in the driveway are used by ROSARIO, his wife, and another female associate of theirs. Based on all of this, I believe that ROSARIO has access to the entire residence at 20 Crestshire Drive, Target Location 1.

written in white, and the numbers "430" are in black above the white door. The white rear door opens into the rear parking lot.

26. Based on physical and electronic surveillance, as well as information from cooperating witnesses described above, Target Location 2 is a stash location used by ROSARIO in furtherance of his drug trafficking activities. The listed owner for the business at Target Location 2, Exotic Multiservice, is Januel Then Rosario, ROSARIO's brother. Based on physical and electronic surveillance, ROSARIO frequents Target Location 2 on a near daily basis—and spends some nights there—however, the business at Target Location 2 has been closed to the public for months. For example, recently on February 21, 2025, investigators observed ROSARIO at Target Location 2 with BRITO, before ROSARIO departed Target Location 2 and went to his primary residence at Target Location 1. In addition, the vehicles operated by ROSARIO—including vehicles used in connection with his drug trafficking described herein—are regularly parked in the parking lot at the rear of Target Location 2. As recently as February 19, 2025, pursuant to a federal warrant, investigators deployed a cell-site simulator to determine the precise location of ROSARIO's cell phone inside the building at 430 Essex Street, which showed that ROSARIO's cell phone was located on the first floor of the building within the multiservice business.

27. As described above, ROSARIO has used Target Location 2 as a meeting location for drug transactions for over a year. For example, on December 3, 2024, ROSARIO met with UC-1 in the rear parking lot of Target Location 2 to conduct a drug transaction, and even told UC-1 to go inside Target Location 2 to obtain the drugs.

28. Investigators also developed evidence of ROSARIO meeting with other drug traffickers at Target Location 2, such as Winiser Then Rosario ("WINISER"). On February 3,

2025, investigators seized twelve kilograms of cocaine from a Jeep Cherokee used by WINISER in Ohio while the Jeep Cherokee was loaded on a car carrier transporting the vehicle from California to Massachusetts. Investigators located the drugs in an after-market hidden compartment inside the vehicle. After investigators seized the drugs, they left an Ohio State Police seizure receipt inside the after-market hidden compartment. On February 5, 2025, investigators conducted a controlled delivery of the Jeep Cherokee in Auburn, Massachusetts as originally intended, and investigators observed WINISER arrive to pick up the Jeep Cherokee at the drop-off location in Auburn, Massachusetts. WINISER entered the Jeep Cherokee and quickly drove away. A short time later, WINISER stopped in a parking lot, got out of the vehicle, and opened the rear driver's side door to check the hidden compartment where the drugs were previously stored. Investigators observed WINISER remove the Ohio State Police seizure receipt from the hidden compartment, before he closed all the doors to the Jeep Cherokee and fled the area on foot, abandoning the Jeep Cherokee.

29. Subsequently, investigators reviewed license plate readers and static surveillance cameras to determine where the Jeep Cherokee travelled prior to being loaded on a car carrier in California and sent back to Massachusetts loaded with drugs. Based on license plate reader photos, the Jeep Cherokee was in the New York City area on January 8, 2025. (The Jeep Cherokee has a registration address in Bronx, New York.) On January 9, 2025, at about 2:43 a.m., the Jeep Cherokee was photographed by a license plate reader in the Lawrence, Massachusetts area. Later that day, the Jeep Cherokee went to 430 Essex Street—Target Location 2—as follows. Based on remote video surveillance and a nearby license plate reader, at about 6:30 p.m. on January 9, 2025, ROSARIO arrived at Target Location 2 entered the rear door to 430 Essex Street. About a half hour after ROSARIO arrived at 430 Essex Street, at about 7:05 p.m., ROSARIO's associate,

BRITO, arrived at the rear parking lot to Target Location 2 and entered the rear door to 430 Essex Street. About one minute later, at about 7:06 p.m., the Jeep Cherokee arrived in the rear parking lot to Target Location 2. The driver of the Jeep Cherokee, who matches the description of WINISER from the video recording, exited the Jeep Cherokee and entered the rear door to 430 Essex Street. ROSARIO and BRITO were still inside 430 Essex Street at that time. The Jeep Cherokee remained running with its lights on while it remained in the parking lot. After the individual believed to be WINISER exited the rear door to 430 Essex Street and reentered the Jeep Cherokee, the Jeep Cherokee departed the parking lot at about 8:51 p.m. Later that night, at about 12:37 a.m. on January 10, 2025, the Jeep Cherokee was photographed by a license plate reader in Westchester County, New York.

30. Accordingly, I believe that evidence of ROSARIO's ongoing drug trafficking activities, including drug distribution paraphernalia, drug proceeds, records/ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, and records of other money transactions, as set forth in Attachment B, will be found at Target Location 2.

**Drug Traffickers' Use of Residences, Storage Spaces, and Cell Phones Generally**

31. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences and stash locations of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and stash locations:

a. Controlled substances.

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i. Firearms and ammunition;

j. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

k. Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact

lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

41. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

42. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

43. Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and

will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

44. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

45. Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

46. During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offense. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency

linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

47. Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, evidence obtained from coconspirators' cell phones demonstrate ROSARIO's use of cell phones in furtherance of his drug trafficking activity. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

48. Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

49. Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking

activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

50. Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e mail, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

51. Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after

it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

**Unlocking Devices Using Biometric Features**

52. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device, and/or content contained on the device, via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

53. On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered

fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

54. The passcodes that would unlock the ROSARIO's devices (hereinafter, the "Target Devices") found during the searches of the Target Locations are not currently known to law enforcement. It may be useful to press the finger(s) of the user(s) of the Target Devices found during the searches of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device, and/or content within the device, for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

55. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with

certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

56. For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects to the sensor of the devices or place the devices in front of his face for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants.

32. The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If, however, law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

**CONCLUSION**

33. Based on the information set forth above, I believe that probable cause exists to conclude that Leury Then ROSARIO did knowingly and intentionally conspire with others known and unknown, to possess with intent to distribute and to distribute 400 grams or more of a mixture or substance containing fentanyl, and methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vi), and that evidence of that offense, as set forth in Attachment B, will be found in the Target Locations, described in Attachments A-1 and A-2.

I, Brian W. Simpkins, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,
/s/ Brian W. Simpkins
__________________________________
Brian W. Simpkins, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ____day of February 2025. February 24, 2025

Page Kelley
__________________________________
Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS